IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 10, 2020

**LEVIE ROBERTS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
No. 13-05763          Paula L. Skahan, Judge

_____

**No. W2019-02165-CCA-R3-PC**

_____

The Petitioner, Levie Roberts, appeals the Shelby County Criminal Court's denial of his post-conviction petition, seeking relief from his conviction of second degree murder and resulting twenty-year sentence. On appeal, the Petitioner contends that he received the ineffective assistance of counsel because trial counsel did not notice before trial that the State's "key" witness gave inconsistent statements to the police and because trial counsel failed to recall the witness to the stand in order to question her about the inconsistencies. Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and TIMOTHY L. EASTER, J., joined.

Shae Atkinson, Memphis, Tennessee, for the appellant, Levie Roberts.

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

In November 2013, the Shelby County Grand Jury indicted the Petitioner for the second degree murder of thirty-four-year-old David Williams. A jury trial was held from August 8 to August 12, 2016, and the jury convicted the Petitioner as charged in the indictment. The trial court held a sentencing hearing and ordered that the Petitioner serve twenty years in confinement at one hundred percent.

After the trial court denied the Petitioner's motion for new trial, the Petitioner filed a timely notice of appeal and the direct appeal record with this court. However, on July 14, 2017, he filed a motion to dismiss his appeal. This court granted the motion to dismiss on July 26, 2017. On November 1, 2017, the Petitioner filed a pro se petition for post-conviction relief, claiming that trial counsel were ineffective because they did not review discovery before trial, failed to interview witness Dr. Anna Slagle, and failed to re-subpoena her for further questioning at trial.[1]

The trial transcript reflects that in April 2013, the victim was living in a home on Philwood Avenue in Memphis with his father and stepmother. About 10:00 p.m. on April 14, the victim drove to a gas station on Summer Avenue to buy a newspaper. When he arrived at the gas station, he got into a verbal altercation with three men in a white Mercury Grand Marquis. The three men were the Petitioner, who was driving the Mercury; Demarcus Allen; and Steven Weathersby. The argument was brief, and all four men went into the store. The victim purchased a newspaper and left. Shortly thereafter, the Petitioner, Allen, and Weathersby returned to the Petitioner's car. They saw damage on the Mercury and thought the victim had hit the Mercury intentionally with his car as he left the gas station. The Petitioner, Allen, and Weathersby went back into the store. They asked the manager if he knew where the victim lived and if they could see the store's surveillance video. The manager knew the victim because the victim was a regular customer but told the Petitioner, Allen, and Weathersby to call the police.

Instead of calling the police, the three men got back into the Mercury and began driving around the neighborhood, looking for the victim's red Ford Focus. Shortly thereafter, they found the Focus parked in front of the victim's father's house on Philwood Avenue. All three of the men got out of the Mercury, and Allen and Weathersby began vandalizing the victim's car. The victim's father heard glass breaking outside and went to the door of his home. He saw someone "messing" with the victim's car and alerted the victim. The victim ran outside while his father, a retired detective from the Memphis Police Department (MPD), went to a bedroom to get a pistol. After the victim's father obtained the pistol, he put the gun into the pocket of his bathrobe and went outside. He saw the white Mercury accelerate and speed away, but he did not see the victim. The victim's father went to the street and saw the victim lying on the pavement. A pool of blood was around the victim, and the victim's legs appeared to have been broken. A woman was tending to the victim.

---

[1] During the post-conviction evidentiary hearing, post-conviction counsel referred to specific parts of the trial transcript when questioning trial counsel. Therefore, we have taken judicial notice of the trial record in State v. Levie Roberts, W2017-00685-CCA-R3-CD. See Harris v. State, 301 S.W.3d 141, 147 n.4 (Tenn. 2010) (noting that an appellate court may take judicial notice of its own records).

Dr. Anna Winter Slagle testified that in April 2013, she was a medical resident and lived across the street from the victim on Philwood Avenue. On the night of April 14, Dr. Slagle heard "some loud banging noises." She looked out her living room window and saw a white car "sitting in the middle of the street." The victim, who was wearing a white t-shirt and dark pants, ran out of his house and was waving his hands. Dr. Slagle said that the white car was "still stationary at that time" and that the victim "planted himself in front of the car with his hands up in the air." The victim was standing several feet in front of the white car, and he did not touch the car. Dr. Slagle said that people appeared to get into the back of the white car and that the white car "went from pretty much 0 to 60." Dr. Slagle did not notice "any hesitation" from the car before it accelerated. The car ran over the victim and sped away.

Dr. Slagle testified that she ran outside to the victim. He was lying in the middle of the street, and blood was coming out of his right ear. She said that her "doctor instinct kind of kicked in" and that she checked him for a pulse. The victim had a pulse and was breathing but was unresponsive. Dr. Slagle looked around for a weapon but did not see one. She used her cellular telephone to call 911.

After Dr. Slagle completed her testimony, a police officer testified about photographs he took at the scene, and the trial court took a brief recess. When the trial court and the parties returned to the courtroom, trial counsel requested to recall Dr. Slagle to ask her an "omitted question," and the following colloquy occurred:

> [Lead trial counsel]: . . . In her primary statement that she gave to a different officer, I don't remember which officer it was, different officer, [Dr. Slagle's] testimony was substantially similar or her statement was substantially similar to the testimony she gave today.

> There is another statement though that was taken right after the time. It's not a formal typed statement. It's only one of the officer's Sergeant Kent noted and had some notes about it, which that's the part we didn't really see until right after she testified.

> And his notes say that she looked out her window, saw a white four-door vehicle speeding down the street with a male white running next to it on the passenger's side. The male white ran out in the street in front of the car and raised his hands but the car kept going, which is a little bit different. It indicates the car was speeding and then he moved in front of the car when it was speeding.

- 3 -

It's different than the typed statement. And the reason we didn't notice it, it's part of his multipage, one of these multipage narratives we see that have a lot of information and it just slipped our attention at the time. I mean, it's essentially an omitted question that we're trying to ask.

I think Rule 607 would allow us to call a witness and impeach that witness. We don't want to call any undue attention to it and make that issue seem any larger than it needs to, so whatever Your Honor wants to do with that, we'll deal with it the way Your Honor wants to do.

THE COURT: Okay. You haven't asked her about this at any other occasion?

[Lead trial counsel]: No, Your Honor. Because again, that small little statement there had slipped my attention. I just noticed it for the first time today. That's on me.

THE COURT: Okay. But, I mean, you haven't had an investigator or anybody ask her about this on any other time?

[Lead trial counsel]: Every time we have spoken with her or anyone's spoken with her, all of the information is always similar to the statement she gave to the separate officer, the actual typed written statement which was given to Officer Craig and that's all different than this one from Sergeant Kent.

. . . .

[The Petitioner] brought that to our attention that there was a separate statement to Mr. Kent -- Sergeant Kent, rather, and we want to just ask her about that if she made a statement to Sergeant Kent and if that's what she told Sergeant Kent.

[Co-counsel]: We need to hear that, Your Honor, for a fair trial.

[Lead trial counsel]: If she told Sergeant Kent that the car was speeding up and then he moved in front or if Sergeant Kent misunderstood.

THE COURT: Your client just pointed out to you in a supplement that the witness supposedly said something different?

- 4 -

[Lead trial counsel]: Right, correct.

The State opposed the Petitioner's recalling Dr. Slagle to the stand, arguing that trial counsel should have impeached her on cross-examination. The trial court ruled that the Petitioner could call Dr. Slagle as a defense witness.

When the State resumed its presentation of proof, Demarcus Allen testified that after he, Weathersby, and the Petitioner found the victim's car on Philwood Avenue, they got out of the Petitioner's white Mercury. Weathersby broke out the rear window on the driver's side of the victim's car. Someone came to the door of the victim's house, so the three men got back into the Mercury. The Petitioner "crunk the car up" and pushed the gas pedal, but the car moved forward slowly. The victim ran outside and began hitting the passenger-side window of the Mercury. The victim ran around the front of the Mercury and began hitting the car on the driver's side. The victim then "jumped in front of the car." Someone said the victim had a gun, and Allen saw the victim reaching for something black on the victim's hip. Allen said that everyone in the Mercury "started ducking" down, that the car's motor finally caught up with the accelerator, and that the Mercury sped up and ran over the victim. On cross-examination, Allen testified that he felt a bump, that he opened the car door, and that he looked back at the victim. The victim was "moving, getting up."

Steven Weathersby testified that as he and Allen were vandalizing the victim's car in front of the victim's home, the victim ran outside. Weathersby saw "[a] white lady" at the bus stop and heard her yell that the victim had a gun, so the Petitioner, Allen, and Weathersby got back into the Petitioner's Mercury. Weathersby said that "everybody just put their head down" and that the Petitioner "threw the car in drive and we just pulled off." Weathersby saw a black pistol in the victim's hand. The Mercury began "picking up speed," and Weathersby "heard a bump." Weathersby acknowledged telling the police that the victim ran in front of the Mercury, that the victim put his hands on the hood like he was trying to stop the car, and that the Petitioner "put the car in drive and sped off and ran over the white guy." Weatherby explained to the jury that he "got it mixed up" because the Petitioner "was already pulling off" when the victim ran to the Mercury. On cross-examination, Weathersby said that the Petitioner's "old" Mercury was slow to accelerate and that "[y]ou got to be pushing it, pushing it for it to pick up speed." He acknowledged that the Mercury "lunge[d] forward" and hit the victim.

The State played Weathersby's audio-recorded statement to a defense investigator for the jury. In the statement, Weathersby said as follows:

> We found his car. We vandalized his car. We wasn't going to do nothing but vandalize his car.

- 5 -

Once we got back into Levie car, I screamed out that he had a gun because he was running out the door with a gun in his hand, which I seen was a gun. So I'm telling Levie that he had a gun. So once I said that, everybody in the car had, you know, ducked down where they couldn't see or get shot so in case he started shooting. So Levie put the car in drive with his head ducked down and just hit the gas trying to get away in case he shot one of us. And as he did that, we felt something go under the car. But like we was saying, that wasn't nothing but a speed bump.

Sergeant Robert Wilkie of the MPD testified that on April 17, 2013, the Petitioner waived his rights and gave a statement. In the statement, the Petitioner said that the victim came outside, approached the Mercury, and had a gun in his hand. The Petitioner thought the victim was going to shoot him, so the Petitioner "ducked down" and "pulled off as soon as possible." The Petitioner said he ran over the victim as the Petitioner was "trying to get away" from the victim. The Petitioner described the victim's gun as "[a] brown wooded rifle" and said the victim was holding the rifle "[w]ith two hands and pointing it out in front of him." Sergeant Wilkie asked the Petitioner if the Mercury had any mechanical problems, and the Petitioner said no.

Dr. Karen Chancellor testified as an expert in forensic pathology that she performed the victim's autopsy. The victim survived a couple of hours in the hospital but died of multiple blunt force injuries due to being run over by a vehicle. The victim sustained several skull fractures and had bleeding and swelling of the brain. The victim had numerous contusions, lacerations, and abrasions on his body, several broken ribs, a broken breast bone, and a broken left tibia. On cross-examination, Dr. Chancellor testified that most of the victim's injuries occurred on the front and right side of his body and that the victim's head injury was fatal. Toxicology testing revealed that marijuana was in the victim's system.

After the State rested its case-in-chief, Sergeant Steve Kent of the MPD's Felony Response Unit testified for the Petitioner that on the night of April 14, 2013, he responded to a call on Philwood Avenue. He spoke with Dr. Slagle about 11:40 p.m. and was "jotting stuff" into his notepad as she was speaking. He wrote a "supplement" to his notes later in his office. Co-counsel showed Sergeant Kent his written supplement to refresh his recollection and asked him, "And what did she tell you?" Sergeant Kent answered,

That she had heard something outside, some loud noises outside and when she looked out she saw a car speeding down the road and at some point she saw a man out there I guess with his hands up in front of the car and this car ran over this man in the street.

- 6 -

Sergeant Kent acknowledged that Dr. Slagle said that the victim was running alongside the moving car and that the victim ran out in front of the car.

On cross-examination, Sergeant Kent testified that according to his supplement, the victim "tried to stop a light colored sedan who was speeding down the street." Dr. Slagle did not say the victim had a gun. At some point, Dr. Slagle came to the police department and gave a formal statement to another officer.

At the conclusion of Sergeant Kent's testimony, the trial court held a Momon hearing. During the hearing, the trial court asked the Petitioner if there were any other witnesses he wanted to call, and the Petitioner stated, "I mean, I thought Ms. Anna [Slagle] was coming back. That's what I was aware of. But I don't know why she didn't come." The trial court responded, "I believe we got the statement in through the officer. We got it before the jury." The Petitioner chose not to testify.

Officer David Wagner of the MPD testified on rebuttal for the State that he responded to the scene and spoke with Dr. Slagle before Sergeant Kent spoke with her. Officer Wagner typed Dr. Slagle's statement into a "PDA," which he described as "a small cell phone . . . that allows us to write what our witness statements are," as she gave the statement to him. He wrote his report from the PDA within one hour. The State showed Officer Wagner his report to refresh his recollection. Officer Wagner then stated as follows:

> She saw the victim David Williams running alongside the passenger side of a white vehicle. The complainant Anna [Slagle] states she then saw the victim David Williams step in front of the white car with his arms outstretched and what appeared to her to be an attempt to stop the white car. The complainant Anna [Slagle] states that the white car then accelerated forward and struck the victim David Williams who was knocked back several feet and fell to the ground. The complainant Anna [Slagle] advised that the white car continued accelerating and the victim David Williams was [run] over.

The State asked Officer Wagner, "And when does she say that she first saw the car move?" Officer Wagner answered, "She said once the victim had stopped and put his hands outstretched and what appeared to her to be an attempt to stop the car."

Sergeant Kevin Craig of the MPD also testified on rebuttal for the State. He said he took Dr. Slagle's formal statement at the police department and typed her answers. She

reviewed her three-page statement, initialed every page, and signed the last page. Sergeant Craig said that according to Dr. Slagle's formal statement:

> [S]he was sitting on the couch when she heard what sounded like a loud boom noise. She got up and looked out her window through her blinds to see what was happening. She saw a white car with a Caucasian male in a white T-shirt running besides the passenger side of the vehicle. The white male ran out in front of the white vehicle waving his hands to stop. He then planted himself in front of the car with his hands in the air. The driver of the vehicle then slammed on the accelerator and hit the male directly, I guess head on. He then flew back a few feet and landed on his back after it happened and the vehicle then ran over him and fled the scene.

Sergeant Craig said Dr. Slagle never said anything about the car moving prior to the victim's planting himself in front of the car. On cross-examination, Sergeant Craig testified that Sergeant Kent was a very good officer and acknowledged that notes taken in the field were important.

During closing arguments, trial counsel asserted that Dr. Slagle's statement to Sergeant Kent, in which she said the victim was running beside the moving car and ran in front of the moving car, was inconsistent with her statement at the police department and her trial testimony. Trial counsel argued that Dr. Slagle's statement to Sergeant Kent, which she gave in her home soon after the event, was an accurate account of what she witnessed and was consistent with Allen's and Weathersby's testimony. Trial counsel asserted that the Petitioner was guilty of voluntary manslaughter, reckless homicide, or criminally negligent homicide, not second degree murder. However, the jury convicted him of second degree murder.

After the Petitioner filed his pro se petition for post-conviction relief, the post-conviction court appointed counsel, and post-conviction counsel filed an amended petition. Relevant to this appeal, the Petitioner claimed in the amended petition that trial counsel were ineffective because they "failed to properly prepare for trial as evidenced by the Petitioner having to point out the inconsistencies in [Dr. Slagle's] testimony" and because they did not call Dr. Slagle as a defense witness.

At the evidentiary hearing, lead trial counsel testified that two attorneys in his office initially handled the Petitioner's case. However, one of the attorneys had a medical issue, so lead trial counsel took over and prepared the case for trial. The second attorney remained on the case and served as co-counsel. Lead trial counsel said that the defense had "quite a bit" of discovery to review and that he either hand-delivered or mailed a copy of the discovery materials to the Petitioner. The Petitioner was in jail while awaiting trial,

and lead trial counsel met with him several times. Lead trial counsel and the Petitioner had "several conversations" about the case, and lead trial counsel was sure he went over the discovery materials with the Petitioner. Lead trial counsel also reviewed the discovery materials himself at least one time before trial and prepared a trial notebook so that he had "everything right there at [his] fingertips."

Lead trial counsel testified that he did not remember if the State made a plea offer but that he would have communicated any offer to the Petitioner. The victim was the son of a former police officer, and the victim's father was "pretty upset." Lead trial counsel said he did not think the victim's father would have been "okay" with any kind of plea. The Petitioner claimed that the victim "jumped out in front of the moving vehicle." Therefore, the defense's theory of the case was that the Petitioner was attempting to leave when the victim came out of the house and that the Petitioner could not see the victim in front of his vehicle because the Petitioner had ducked down. Lead trial counsel described the incident as "heated." He said that provocation existed because the victim was coming toward the car and because the victim's father had a gun. Therefore, lead trial counsel "definitely" would have discussed voluntary manslaughter with the Petitioner.

Lead trial counsel testified that the defense hired a private investigator but that the victim's father refused to speak with the investigator. Lead trial counsel did not think the defense spoke with any police officers before trial. However, the defense would have reviewed their reports. Lead trial counsel said that he thought he spoke with Dr. Slagle before trial and that "details" of her statements were in discovery. Lead trial counsel saw Sergeant Kent's supplement in the discovery materials but did not notice that the supplement claimed Dr. Slagle saw the victim run in front of a speeding car. Lead trial counsel did not ask Dr. Slagle about the statement on cross-examination, but the defense "ended up putting the officer on, instead of recalling her, due to some scheduling." Lead trial counsel explained, "[O]nce we put the officer on to get that information [in], we didn't think it was really necessary to bring her back. . . . But we got the information we wanted from the officer." Post-conviction counsel asked how trial counsel could have overlooked Dr. Slagle's inconsistent statement in Sergeant Kent's supplement, and lead trial counsel answered, "Sometimes when you've got hundreds of pages, . . . a sentence might just slip past you." Trial counsel were able to correct their mistake, though, by getting the information to the jury though Sergeant Kent's testimony. Lead trial counsel said he thought Dr. Slagle's written statement at the police department was "pretty similar" to her trial testimony.

Lead trial counsel testified that he advised the Petitioner to pursue a direct appeal of his convictions but that the Petitioner "wanted to go straight for post-conviction." The Petitioner "was not happy with the trial" and "made it clear" that he no longer wanted trial counsel's law firm working on his case.

On cross-examination, lead trial counsel testified that he had been practicing law for eight years at the time of the Petitioner's trial. He practiced mostly criminal defense, and he had handled first and second degree murder cases. The defense had some indications that the State might re-indict the Petitioner for first degree murder, and the State would not negotiate on a charge less than second degree murder.

Lead trial counsel acknowledged that no weapon was recovered from the victim. He said that Dr. Slagle was a "very good" witness for the State to have because she probably did not need any "coaching" and because she was "used to dealing in high stress situations." Lead trial counsel said the defense got "the best of both worlds" by not calling Dr. Slagle back to the stand. He explained, "And she couldn't get up and say, 'No, I deny it. I didn't make that statement. He wrote it down wrong.'" Lead trial counsel acknowledged that by not calling Dr. Slagle back to the stand, Dr. Slagle was not able to explain the inconsistent statement she gave to Sergeant Kent. Trial counsel also addressed the inconsistent statement during the defense's closing argument.

Dr. Slagle testified for the Petitioner that after the Petitioner's car hit the victim, she spoke with several police officers. She said she would have told them as follows:

> I saw -- as I was looking out my window, an individual running out from the home across the street and there was a white car that was stationary in the middle of the street and this individual ran in front of that car with his hands in the air, and then that car proceeded to go from what I perceived as stationary, to full speed and ran over the individual, and fled the scene.

Post-conviction counsel then showed Sergeant Kent's written supplement to Dr. Slagle and asked her to review it. The supplement, which post-conviction counsel introduced into evidence as an exhibit, provided as follows:

> [Dr. Slagle] looked out her window, and saw a white, 4 door vehicle speeding down the street westbound, with a male white running next to it on the passenger side. The male white ran out into the street in front of the car, and raised his hands for the car to stop, but the car kept going, and ran over Mr. Williams.

Post-conviction counsel asked Dr. Slagle, "Is that a true statement in regards to what you actually saw that day?" Dr. Slagle responded, "It is not. No, the car was always -- that I saw was stationary. It was never, never moving."

On cross-examination, Dr. Slagle acknowledged that her statement to Officer Wagner was "more consistent" with what she saw and told the officers. She said that if she had been asked about Sergeant Kent's supplement at the Petitioner's trial, her testimony would have been the same as her testimony at the evidentiary hearing.

Sergeant Kent testified for the Petitioner, and post-conviction counsel showed the supplement to him to refresh his memory. Sergeant Kent said that he wrote the supplement from his notes and that the supplement was not a formal statement from the witness. He said he would not have written something in his supplement that the witness did not tell him.

On cross-examination, Sergeant Kent acknowledged that he did not write down "verbatim" what Dr. Slagle said. He stated that a supplement did not contain all of the details about an incident and that he could learn additional details from a witness's formal statement or testimony. On redirect examination, Sergeant Kent testified that his supplement in this case did not specify whether the Petitioner's car was moving or stationary when the victim moved in front the car. He acknowledged that he had no reason to dispute his supplement and that he thought it accurately reflected what Dr. Slagle told him.

The Petitioner testified that his family hired trial counsel's law firm to represent him. The Petitioner was in jail about three and one-half years, and trial counsel met with him in jail "maybe five times." Trial counsel provided discovery to the Petitioner, the Petitioner reviewed the discovery materials, and the Petitioner "pointed out" to trial counsel what his defense would be at trial. Specifically, the Petitioner pointed out "[t]he inconsistent statements of the eyewitnesses."

The Petitioner testified that Dr. Slagle gave two statements on the scene to two different officers. Two or three hours later, she gave a statement to an officer at the police department. Her statement at the police department was inconsistent with her two statements at the scene. In her two statements at the scene, Dr. Slagle said the victim ran in front of the Petitioner's car while the car was moving.

The Petitioner testified that he and trial counsel talked about his defense and the State's plea offers. The State's first offer was for a sentence of twenty years, and the State's second offer was for a sentence of thirteen and one-half years. Co-counsel told the Petitioner about the offers and said he would "fight for . . . a lesser-included offense" at trial. He also told the Petitioner that he would show the jury that the victim's father had a gun. The Petitioner decided to go to trial. When he got to trial, though, trial counsel did not know that Dr. Slagle's inconsistent statements were in the discovery materials. The Petitioner "had to point it out" to trial counsel in the middle of trial. Trial counsel did not

cross-examine Dr. Slagle about her two inconsistent statements or call her back to testify despite the trial court's giving trial counsel the opportunity to do so.

On cross-examination, the Petitioner acknowledged that trial counsel met with him when he came to court and that an investigator worked on his case. However, the Petitioner met with the investigator "[m]aybe twice." He said that he did not graduate from high school, that he had never been in trouble prior to this case, and that he did not know anything about a trial. He said trial counsel should have called Dr. Slagle back to the stand and questioned her about her inconsistent statements.

On redirect-examination, the Petitioner testified that trial counsel claimed they did not recall Dr. Slagle because they were "trying to save time." However, the Petitioner's jury was selected on Monday, Dr. Slagle testified on Tuesday, and the jury announced its guilty verdict on Friday; therefore, trial counsel "had more than enough time" to call Dr. Slagle back to court.[2] On recross-examination, the Petitioner testified that if he had known trial counsel "wasn't going to cross-examine eyewitnesses, [he] may would have pled guilty." The Petitioner acknowledged that he turned down a twenty-year offer from the State. At that point, the assistant district attorney general, who also represented the State at trial, advised the post-conviction court that her trial notes reflected she made one, twenty-year offer to the Petitioner.

The post-conviction court filed a written order denying the petition for post-conviction relief. In the order, the post-conviction court found that even if trial counsel failed to notice in the discovery materials that Dr. Slagle gave two statements on the scene that were inconsistent with her trial testimony, the Petitioner was not prejudiced by the deficiency because lead trial counsel testified that Dr. Slagle's inconsistent statements were revealed to the jury through Sergeant Kent's testimony. The post-conviction court further found that the Petitioner was not prejudiced because lead trial counsel testified that not calling Dr. Slagle back to the stand "worked to Petitioner's benefit" in that it allowed the jury to assess the witness's credibility "without giving her the opportunity to explain why she may have made the inconsistent statements." Accordingly, the trial court ruled that the Petitioner was not entitled to post-conviction relief.

## II. Analysis

On appeal, the Petitioner maintains that trial counsel were ineffective for not noticing that Dr. Slagle, who was the State's "key" witness, gave two statements right after

---

[2] The trial transcript confirms that the jury was selected on Monday, August 8, 2016; that lead trial counsel requested to question Dr. Slagle about the "omitted question" on Tuesday, August, 9, 2016; and that the jury found the Petitioner guilty on Friday, August 12, 2016.

the incident that were inconsistent with her statement at the police department and that he was prejudiced by trial counsel's "mistake" because "the driving force for the jury to determine intent was whether the victim ran in front of a moving car or whether the victim was standing in front of a nonmoving car prior to the car speeding up and running over the victim." The Petitioner also contends that trial counsel were ineffective because they failed to call Dr. Slagle back to testify after the trial court gave them an opportunity to correct their mistake. The Petitioner asserts that at the evidentiary hearing, Dr. Slagle's "story continued to flip back and forth"; therefore, recalling her to the stand at trial would have discredited her testimony. The State argues that the Petitioner failed to demonstrate that he received the ineffective assistance of counsel. We agree with the State.

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Further,

[b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

Turning to the instant case, Dr. Slagle testified at trial that the Petitioner's car did not move until the victim "planted" himself in front of the car. After her testimony concluded, trial counsel discovered that her testimony was inconsistent with the statement she gave to Sergeant Kent on the scene. Trial counsel requested to call Dr. Slagle back to the stand to ask her about the inconsistency, and the trial court ruled that trial counsel could call Dr. Slagle as its own defense witness. However, instead of calling her as a witness, trial counsel chose to call Sergeant Kent to testify. Sergeant Kent testified that Dr. Slagle told him that the Petitioner's car was moving and that the victim ran in front of the moving car.

At the evidentiary hearing, lead trial counsel testified that he was able to get Dr. Slagle's statement that the car was moving when the victim ran in front of the car into evidence through Sergeant Kent's testimony. He also testified that calling Sergeant Kent to testify instead of Dr. Slagle was beneficial to the defense because it prevented Dr. Slagle from being able to explain the statements she gave at the scene. During closing arguments, trial counsel addressed the statements and asserted that Dr. Slagle's statement to Sergeant Kent, which she gave closer in time to the incident, was accurate. As this court has stated, "When reviewing trial counsel's actions, this court should not use the benefit of hindsight to second-guess trial strategy and criticize counsel's tactics." Irick v. State, 973 S.W.2d 643, 652 (Tenn. Crim. App. 1998). On appeal, this court may not second-guess the tactical or strategic choices of counsel unless those choices are based upon inadequate preparation, nor may we measure counsel's behavior by "20-20 hindsight." See State v. Hellard, 629 S.W.2d 4, 9 (Tenn. 1982). We note that during the evidentiary hearing, post-conviction counsel confronted Dr. Slagle with Sergeant Kent's statement as the Petitioner had wanted trial counsel to do at trial. Dr. Slagle reiterated that the Petitioner's car did not move until the victim stood in front of the car, that Sergeant Kent's supplement was incorrect, and that she would have said so if asked about the supplement at trial. Therefore, even if trial counsel were deficient for not noticing Dr. Slagle's inconsistent statements in the discovery materials, we agree with the post-conviction court that the Petitioner has failed to demonstrate prejudice.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

_____
NORMA MCGEE OGLE, JUDGE